**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **MARY KATHLENE DESSI,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **GEEKS WHO DRINK, LLC** | § | **CIVIL ACTION NO.** |
| | § | |
| *Defendant.* | § | |
| | § | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Mary Kathlene Dessi (hereafter referred to as "Plaintiff" or "Dessi"), by counsel and brings this action for violations of 42 U.S.C. § 1981 and The Texas Labor Code on the basis of her race and national origin, her sex (gender) and in retaliation for her protected activities, complaining of Defendant Geeks Who Drink, LLC (hereafter referred to as "Defendant" or "Geeks") and respectfully shows the Court as follows:

## I.

## PARTIES

1.01.    Mary Kathlene Dessi is an individual, who is a citizen and resident of the State of Texas, who may be contacted through her undersigned counsel of record.

1.02.    Defendant Geeks Who Drink, LLC is a foreign limited liability company with its principal place of business located at 1701 Wynkoop St., Ste. 230, Denver, CO 80202.

Defendant's agent for service of process in the State of Texas is COGENCY GLOBAL INC., 1601 Elm St., Suite 4360, Dallas, TX 75201.

## I.

## JURISDICTION AND VENUE

2.01.    Jurisdiction is conferred on this Court by 28 U.S.C. § 1331.

2.02.    Venue for all causes of action stated herein lies in the Southern District of Texas because the Defendant resides in this District and because a substantial part of the events alleged in this Complaint took place within this District.  *See* 28 U.S.C. § 1391(b).  Plaintiff's EEOC charge was filed and pursued in the Southern District office of the EEOC.  Plaintiff received her Notice of Right to Sue and has timely filed this lawsuit.

## III.

## FACTUAL ALLEGATIONS

3.01.    On or about July, 2012 Plaintiff, a white female (half Italian), began working for Defendant as a Trivia Host.

3.02    Plaintiff enjoyed working for Defendant and was doing well.  Plaintiff was promoted to Sales Director in February of 2021 with an annual compensation of $92,000.

3.03    2018: At some point in 2018 Plaintiff was given a salaried position as the in-house audio/video round producer.  Plaintiff had to go through several rounds of negotiations because Defendant was offering salaried rates that would have been below Plaintiff's per round rate given the amount of work Defendant was requesting. As Plaintiff was not going to be paid any overtime,

Plaintiff didn't want to settle for what would have amounted to a pay cut. At the conclusion of the pay negotiation process Christopher short, the man who oversaw pay negotiations for all editorial staff members, told Plaintiff that it was "cool" for a girl to be the highest paid "writer." That statement, combined with the attempt to give Plaintiff a pay cut was insulting and left the Plaintiff feeling like she had been reduced to nothing more than her gender, and that she was not valued for her abilities or talent, only as someone to pad the number count.

      3.04    Late 2018, early 2019: The editorial team decided to bring on a new freelance video and visual round creator, Grant Thackery to fill in gaps in the event Plaintiff wanted to take a week off or had an emergency. When determining what Grant's starting pay would be Plaintiff was asked what her starting pay was. Plaintiff informed Aaron Retka (the then AV editor who was asking Plaintiff) that she was started at $50 and eventually bumped up to $65. The reaction from Aaron Retka (the video and visual round editor) to those numbers was clear. That rate was too low for the work. Too low for a man, but it was adequate for Plaintiff. It was made clear Plaintiff was to drop the topic.

      3.05    Throughout 2019:  There were daily meetings for the editorial team. Among other things the goal was to read over the content to confirm questions were fair and easy to understand, and to come up with current events related rounds. These meetings turned into exercises in humiliating Plaintiff for coming from a different background. Plaintiff grew up a female in a bi-racial house. Plaintiff's father is a brown man who immigrated to the United States from Sardegna in the late 70s. English is his 5th language. Plaintiff's mother is psychologically unstable (suicide attempts, multiple bankruptcy filings, theft, electroshock therapy) and Plaintiff's dad was a waiter

up until he got into construction and interior remodeling in the mid-90s. As kids Plaintiff was excluded from the neighborhood rideshare because neighbors thought her father, her, and her sisters were Mexican. Every time Plaintiff went to a new school it was a struggle to get out of the ESL and remedial classes and into the honors classes because in Carrollton people just assumed Plaintiff was Mexican because of her last name, her dad's skin color, and her hair and eyes. Plaintiff grew up eating squid, octopus, mussels, gnocchi, prosciutto, and other coastal Italian and island dishes that Plaintiff got made fun of for as a kid. We listened to Italian disco, watched movies starring Italians, and celebrated Columbus Day. As a girl Plaintiff never watched G.I. Joe. Plaintiff saw the Godfather instead of Star Wars, and while Peter Falk wasn't Italian, Colombo played on a loop for about 10 years in syndication in Plaintiff's house. Plaintiff also was not raised in a religious house. The Bible was just another fiction book and never given importance. The content was littered with late 80s and early 90s American pop culture, and an odd number of questions that only someone who spent a lot of time in church would know. Which is fine for trivia, but when Plaintiff didn't understand any of the references, she was mercilessly mocked despite supposedly being in the read through to add diversity of though and insight. Plaintiff explained that she just had a different frame of reference, and that majority of the editorial staff grew up boys in all American, white households in middle America, but Plaintiff did not. Plaintiff grew up a girl, born 5-10 years after them, in a mixed-ethnicity, immigrant household, so it wasn't reasonable for Plaintiff to have the same cultural reference points. Instead of appreciating differences or celebrating them, Plaintiff was dubbed an alien who ate squid and food with tentacles like something weird. Alien being one of many slurs hurled at Plaintiff and her father

throughout the years. Alien, a slur used to denote separation, to isolate, and to highlight and implicitly condemn difference between native groups and immigrant groups. The ridicule was intense, it was daily, it was isolating, and Plaintiff did not think she could say anything without risking her job. A job that Plaintiff needed at the time.

3.06    Alongside this, Christopher and the men on staff doubled down on pointing out instances of "too much man knowledge" and "needing more women knowledge." There were only two other women who were ever on calls that typically had 7-9 people. One, Lea, generally sat in silence. The other, Diana, someone who is close personal friends with Christopher would routinely nod in agreement with Christopher's calls for less man and more woman knowledge. Any protestation that "science is not knowledge that is unattainable by women" or "I've been to gaming conventions and I'm not exactly in the minority as a female" was met with emotions ranging from condescension to outright anger. As if Plaintiff, a woman, were too stupid to know that her kind didn't understand the complexities of science, math, games, etc.

3.07    At one point, in an attempt to appeal to women, there was a question in a round Plaintiff happened to be reading on a call full of men about monthly cycles. Getting to that question Plaintiff had never been so uncomfortable. Plaintiff was on a Zoom call with a sea of male faces, and when Plaintiff refused to read the question.  Plaintiff will never forget the sea of dread, anxiety, and humiliation. Plaintiff refused to read it, and stated that she thought it was horribly unfair to any female host to be asked to read the question during trivia night, on a stage, in a bar full of men. (Because while the gaming conventions, and the horror movies, and Plaintiff's stat classes were fairly balanced when it came to men and women, trivia nights were overwhelmingly attended by

men.) Plaintiff said even if some female hosts might be okay with it, others wouldn't, but also that Defendants had no idea how women players in a bar full of men would feel hearing a male host crack the joke/read the question. Lea remained silent. Diana only spoke up to say she felt the question was pandering, but the men on the call took turns explaining to Plaintiff that Plaintiff's feelings were invalid, and that she should not object to the question or have problems reading it. Christopher then took Plaintiff's extreme discomfort and turned it into a running joke. For several months following the incident, he'd go out of his way to compare awful things to cramps.

3.08     Doubling down on the idea that the one part of knowledge women would be most excited to be asked questions about, Christopher Short and Aaron Retka, in a conversation to determine what sort of rounds they should have at Geek Bowl specifically to appeal to women, came up with an entire round on feminine hygiene products. Because that's what women know about.  This all unfolded over Zoom call for the most part.

3.09     2019: Sales in Texas in particular slowed down across the state. Defendant had hit a point of saturation, and on January 2, 2020 both Dave Stone Robb and Plaintiff, along with a couple of other salespeople were cut loose from sales due to a desire to trim the sales staff, and a belief that they sort of maxed out Texas to the point it did not make sense to have people dedicated to areas in the state.

3.10     March 2020: Geeks shut down entirely. Plaintiff remained in a volunteer capacity to help with weekly Twitch streams because she didn't have anything else to do, and she didn't know what was going to happen.

3.11     April 2020: The second Twitch stream was hosted by Taylor Wynn. A younger,

attractive female. During her stream there was a live chat in the editorial slack. It took all of 10 minutes for conversation to turn to Taylor's breasts – her two special somethings. Plaintiff was wildly uncomfortable by the conversation and thought it in extremely poor taste to objectify one of the few females in the company in that manner.

3.12    Late Q2/Early Q3: The company secured a PPP Loan, and started putting on Zoom-based trivia. The bulk of the hosts were men. They had one girl, Nicole, who they wanted to have on because she was black (they explicitly said they wanted to use her as often as possible on camera because of her skin color, mind you, editorial was 100% white, but on camera…), a woman Stefanie, a man named Tanis who states he is a woman, and a woman Anne who is sleeping with an internal male employee (AJ Brown, her husband). Defendant put up BLM banners on the Twitch stream, and to the best of Plaintiff's knowledge has left them up. Defendant had the only non-white people in the ranks hosting it. They try to present as very open and accepting, but behind the scenes it's a bunch of men who are openly hostile to women who have opinions and immigrant or immigrant children who have a different cultural reference point.

3.13    Generally speaking, the company culture was one that was obsessed with race, gender, and ethnicity. Despite being majority white, American-born, men, they spoke of the evils of white, American-born men as if they were the lone exceptions. In the process of doing so, they insulted as many non-white, non-Americans (men and women, but often women) as possible. Christopher cited a presence of Taco Bells in his town as proof that Crawfordsville had Mexicans. Aaron and Christopher had a discussion during the 2020 elections about how blacks, Muslims, and gays were all the same. It was non-stop, and Plaintiff repeatedly asked that these types of

conversations be kept to a political thread where Plaintiff didn't have to see them. Plaintiff's understanding is they actually did create a Politics thread, they just were incapable of keeping the commentary to it. As someone who comes from a multi-ethnic and multi-racial household, in addition to being a woman, Plaintiff was always left feeling like an outcast. The fact that her co-workers refused to contain the insulting and offensive remarks to a thread she was not in, but instead posted them to the general forums where Plaintiff was forced to remain a member of for work, represented an endorsement of the attitudes and beliefs by management.

3.14    Late Q3/Q4: While helping out with some marketing efforts and ticketing analysis Plaintiff uncovered a ring of players who had been scamming the company out of tickets via a coding loophole. Defendant lost several hundred dollars because of it. It might not seem like much, but it was about a week's worth of online host pay at a time Defendant was losing money. It was Matt Angel's (the then COO) job to monitor sales and keep track of revenue. This is the duty he had given himself as COO. He wasn't able to do it, he didn't know how to run numbers or clean and process data. He was relying on a flawed system that allowed $0 sales to go unnoticed. Plaintiff found it, and figured out why it was happening/what the exploit was. Plaintiff identified who had been running the exploit and her work directly resulted in closing off the exploit. Matt kept his job, and Plaintiff was not acknowledged.

3.15    Around this time Plaintiff started working closely with Bryan Carr. Also around this time the marketing director was laid off, and everyone who was still around, even those not in editorial were merged into the editorial Slack. Christopher spent a week going through every message he had ever sent, deleting them one by one, because of all the inflammatory stuff that he

had said about John Dicker and several people he was adding to the team. Plaintiff told Bryan that she might like to move into the marketing director spot, and Bryan observed that Plaintiff would be the first marketing director they ever had with a background in business. Bryan encouraged Plaintiff to approach Matt Angel about it. Matt was the COO and would have made the decision. Matt said he would run it by Christopher (who was only the Chief Editor and thus fell beneath Matt) out of respect for the fact that he would be taking one of Christopher's employees away from him. Plaintiff was told she was not allowed to be considered for the role.

3.16    Early January 2021: The next thing Plaintiff knew Bryan Carr was being promoted to Marketing Director despite already having a full time job. Christopher was crowned the CEO despite having zero business background. And someone named Mike Ferril was announced as the CFO despite having two other jobs already. None of the positions were advertised/posted, the assignments were simply made.

3.17    Jan 22, 2021: A group of female Geeks Who Drink employees (Taylor Wynn, Jeanette Cerami, Lindsay King Meyers, Cassie Valdez, Chelsea Wright, Plaintiff, and Stefani Thomas) had a lengthy zoom call (2 hours ish) lamenting the state of Geeks Who Drink. Some of the ladies disclosed that Christopher Short had been inappropriately forward with them at past Geek Bowls. Most of the women on the zoom call agreed he treated them as less than the men and ignored them. They felt as if we'd been passed over for promotions in favor of men. They discussed that it was not limited to Christopher. All of them had experienced multiple negative interactions where being a woman felt like a handicap. Since that meeting Taylor, Jeanette, and Cassie all quit. At least part of their decisions to leave had to do with how they had been treated. There was no

recording of the meeting.

3.18    Feb 2021: The company had finally decided to start doing live events in bars, and Plaintiff was the only person who had any sales experience, and Plaintiff had been compiling reports for the online trivia events. Plaintiff was appointed "sales director" and pulled together a presentation along with Bryan Carr to jointly set up sales and marketing targets as well as ask for pay.

3.19    Out of all of that came a pay schedule that pegged Plaintiff's pay to OVERALL company revenue, and Bryan was given a salary. Plaintiff was to be classified as a salaried employee, and every time revenue hit certain milestones, Plaintiff's salary would increase. Plaintiff was not given salespeople, and she was not given a commission or any pay that was tied to sales efforts directly. Bryan/marketing was responsible for revenue generation and Plaintiff did not have the ability to influence that revenue beyond making suggestions. A third man, Eric Kohen who had been the Private Events director was salaried. Plaintiff had no ability to influence that revenue. Even Matt Angell, the COO/Director of Operations was paid a salary despite his department being responsible for client retention – directly tied to revenue. But of all the directors who were responsible for generating revenue, Plaintiff was the only one whose pay was tied to revenue, and Plaintiff's pay was tied to total company revenue, not sales revenue or number of bars signed.

3.20    This was a sticking point the entire time Plaintiff was in the role. Plaintiff was expected to work round the clock, without any overtime pay, and without any compensation for her efforts outside her base pay. Plaintiff was still producing video and visual rounds for editorial and did not receive additional compensation for that either.

3.21    Q1: Generally this quarter was spent getting ready to go back into bars live. There was a lot of tension on this front as multiple people inside the company protested doing live shows, feeling that it was "too soon." Operations feeling like they didn't want to go back too fast (which made sense – their pay was not tied to revenue. Matt Angel pushing back against attempts to reach out to former bars on a large scale. Plaintiff spent most of this quarter working with Bryan to get sales collateral and general readiness type things.

3.22    Q2: Q2 marked the start of Operations reaching out to past clients. Plaintiff realized bars were not coming back at a very fast pace, and that Defendant's competitors were going back into bars at a much faster clip than Defendant was. Plaintiff found out that the bulk of operations outreach efforts were emails. Plaintiff was told that they did not want to start signing new bars until they had made sufficient reboot efforts because Christopher and Matt did not want to "take away" nights from past clients. Again, Matt's pay was not tied to revenue generation so he was in no hurry. Plaintiff's pay was, so she was. Also, Christopher had been hiring full time employees at an alarming rate giving the lack of revenue. Defendant was relying on PPP loan money.

3.23    Plaintiff relayed to Bryan that she was frustrated, and that she wanted to be in charge of the reboot push, because she wanted better efforts to be made. Specifically, Plaintiff wanted to be calling bars and bar owners in addition to emails, and keep calling until she got someone on the phone to confirm if a bar was returning or not. Bryan agreed with Plaintiff's suggestion, and mentioned that his wife would be willing to help as she had just helped run a similar phone campaign to find out which former trivia hosts would be interested in returning.

3.24    Plaintiff spoke to Christopher with Bryan on a call to propose a call campaign that

would be organized, have bars assigned to specific people who would be required to document calls with notes, and follow contact and update schedules. It is worth noting at this point that Plaintiff found that in order to be heard, or acknowledged by Christopher she had to work through Bryan due to Christopher's apparent refusal to acknowledge that even a woman with two separate masters in business related fields and several years of sales experience might have some idea of what she was talking about. Christopher said that he'd need to run Plaintiff's plan by Matt.  There were several back and forth messages via Slack and Zoom chats with Christopher chatting with Plaintiff and then with Matt, but never the three of them at once. Out of that Christopher told Plaintiff that Matt and operations did not want Plaintiff to be leading the reboot effort, and that they would give Plaintiff a list of bars they were unlikely to be able to reach, and Plaintiff could work with Danielle and 2 others who volunteered to help on the "difficult" list. Also out of all those back and forth Plaintiff was called into a meeting with Matt and Christopher and scolded for being too abrasive and creating too much drama. Plaintiff was made to feel like her place was to keep her mouth shut, and stop trying to improve the reboot process because it made Matt uncomfortable, and left Matt confused. Matt had been uncomfortable since Plaintiff found out he had been mishandling ticket data.

3.25    Bryan Carr tracked the reboot efforts, and the team that Plaintiff managed, despite having been given the bars that operations did not want to call, and despite having all of Plaintiff's volunteers except for Danielle Carr back out of calling out-performed the operations efforts. Danielle followed a script Plaintiff gave her, she documented her calls, she followed direction about what to do if she was having problems reaching someone, and she rebooted almost half of

all bars they went back to. In operations, there were four people making calls – Stefani Thomas, AJ Brown, Lex Simpson, and Dan Brown. Dan by all accounts wasn't making calls. He went weeks without getting a reboot. AJ was almost as ineffective. Lex was not much better. Stefani did get a significant number of bars. Matt was never able to explain why they were lagging, and eventually was moved from operations to "technology." The official line is that he asked to be moved.

3.26    Stefani Thomas was made temporary manager of operations (or some similar title). She was not given a director title, and she was expected to continue to do all the work she had been doing as if she were equal with AJ, Lex, and Dan.

3.27    Dan was eventually fired after being given warnings about needing to improve. Though Plaintiff believes he was technically laid off as Defendant had to make a few cuts to payroll at that time due to Christopher having over-hired, and having allowed Matt to drag his heels on the reboot efforts.

3.28    While all this was going on, a man, Jon Pio, was appointed Chief Technology Officer. The role was never advertised. It is a role that never existed. It was a role that was seemingly created for him because he lost his job at Microsoft and was a man in need of work, and John Dicker and Christopher Short had a habit of providing high paying jobs to men. Existing employees were not given the chance to apply for jobs that were given to men.

3.29    As the reboot effort continued, when Danielle got a bar that wanted to reboot, the process in place was that she would let Plaintiff know, and Plaintiff would create a notification for Operations on the bar's page in their CRM software (Podio). AJ, Lex, and Dan were all three guilty

of simply not following up with bars. They weren't documenting calls, and Plaintiff could see in her sales suite (Hubspot) that no emails were being logged. They'd call SOME bars, but not all. This significantly slowed the reboot efforts and due to pay structures in place, cost Plaintiff to not advance her pay as fast as she might have if they had been doing their jobs, but it cost those three nothing as their pay was not tied to their efforts. Only my pay was tied to their efforts, and I did not have the ability to do anything about their behavior other than allow Bryan Carr to present numbers and press the three men to follow up with bars that Danielle had set up for them.

3.30    All the while the reboot was underway, Plaintiff had started fielding sales leads and signing up new bars. That required coordination between operations, and with Stefani as the head instead of Matt, things actually ran a lot smoother communications wise. Stephanie was willing to speak with Plaintiff, and generally on top of things in a way that Matt Angel was not. She was also willing to speak to the boys when they weren't responding to clients. Basically, she didn't block Plaintiff out because Plaintiff was a woman, and they had a mutually respectful working relationship. She let Plaintiff know that in operations meetings Matt would openly blame Plaintiff for any of his own miscommunications, and went out of his way to paint Plaintiff a villain. When Plaintiff took this to Christopher, he told Plaintiff to let it go.

3.31    Innovation during Q2: In addition to working on signing new bars, Plaintiff was also working on product innovation. In Q2 Plaintiff pushed through a theme quiz program. Defendant had always let bars have a themed trivia night if they wanted, but Defendant never had anything formal. There were no list of offerings, no official price structure, no media kits. Nothing. Plaintiff put together a program that spelled out the price, formalized a promo kit for bars to market

themselves, set up clearly defined guardrails that all bars would receive to define what nights they would be allowed to run a theme night, marketing tips, and successfully petitioned to get theme events listed on the website as a category trivia players could go to, to find where a theme was happening. None of this happened before and it was 100% Plaintiff's invention. It was a huge money maker.

3.32    Ongoing issues during Q2 2021: Plaintiff was working 12-16 hour days. At the end of Q2 Plaintiff asked to stop doing audio and video rounds. Plaintiff had started begging to hire a salesperson to help field the inbound requests. In leadership meetings Plaintiff would get asked what the outbound sales plan was, and Plaintiff's answer was the same, that she needed a staff. The head of editorial, Aaron Retka didn't have to write any rounds. The head of Private Events, Eric Kohen, had at least one full time staff person and he did not do outbound outreach. When Matt was head of operations had a staff to delegate to so that he didn't have to mess with day-to-day bar management. Bryan had someone to make his marketing assets and he had hired a full time assistant. The only female Director was also the only Director who had zero help, and Plaintiff was labeled a "complainer" because she did not want to work 12-16 hour days without compensation. Women complain after all. Plaintiff was accused of whining, of bitching, and of complaining.

3.33    Q3 2021: Sales hit an obstacle in that Plaintiff had bars interested in signing up fresh, or Danielle would have bars wanting to return from hiatus, and Plaintiff and Danielle just didn't have any hosts for them. They had a couple of options for bars where they could run trivia if they had their own host to provide, but most bars wanted full service. Jeanette Cerami had been

working on hiring new hosts, and Plaintiff was never included in those efforts. Plaintiff believes she reported to Matt, and she quit before Stefani Thomas was sort of appointed to operations. JonPaul Guinn was moved from editorial and given a job to hire new trivia hosts. He was given two different staff to help him. Not having hosts remained a problem. Christopher decided to take the role of finding new hosts away from operations, and JonPaul didn't really have anyone he had to answer to. Stefani was not able to hold him accountable, and Christopher wasn't interested in giving her that ability. Yet another instance of diminishing the role of women  at every step. They had weekly meetings with ops, sales, marketing, and JonPaul. Week after week it was the same. Pats on the back for sales for bringing on plenty of new bars, pats on the back for ops and Danielle on the reboot efforts, they never discussed marketing efforts, and JonPaul had lots of reasons that he wasn't hiring and they had to leave bars hanging. He was hiring some people, but not nearly at a rate that Defendant needed, and it created a bottle neck despite him being on a three-person team. And again, that bottleneck did not impact a single person's pay except for Plaintiff's, and she had zero ability to hold

3.34    During this quarter Christopher told Plaintiff that he had asked Danielle if she wanted to become a sales person. He asked if Plaintiff was okay with it. Plaintiff was not. Plaintiff did not want to hire the wife of the person she worked most closely with as that creates an awkward dynamic. Plaintiff was also disheartened. Again, the men in the company were always allowed to conduct their own hiring. Plaintiff wasn't even told she could hire. Christopher offered the job to Danielle when he visited Danielle and Bryan on a trip to see a baseball game. He told Plaintiff after offering Danielle a job. A job that he offered to the woman who was sleeping with the

marketing director. Plaintiff had nothing personal against Danielle, but she had no sales experience. Plaintiff might have hired her out of the lot of whoever might have applied for the job, but there was no chance to interview and pick the best applicant.

3.35    Once Danielle was hired, Plaintiff had to fight to get her paid a minimally fair pay. Plaintiff was not allowed to offer her commission, and Plaintiff was told to hire her at $40k. That is an unreasonably low pay for sales as anything other than a base. But she wasn't getting commission.  Plaintiff argued that she was not willing to perpetuate the company policy to hire women into low-paying/under-paying positions, and that if nobody else was willing to fight for women to get paid for the work they did, Plaintiff would. Christopher became quite angry when Plaintiff suggested women were underpaid relative to men, or that women disproportionally made up the lowest paying positions. He let Plaintiff know that while the company had a history of mistreating women, that was before him. Plaintiff was able to secure Danielle $60k. Plaintiff was clear with her. She wasn't getting commission, and the company didn't do overtime, so Plaintiff did not want her working a second over 40 hours.

3.36    Because she was officially hired, and because they were in enough bars, with enough new bars to keep operations busy, sales took over the reboot efforts entirely.  Through about October or November Plaintiff had Danielle working exclusively on reboots. It was a good way to train her up on Hubspot, and get her used to policies for bars while they cleared out bars that simply would not be returning. Plaintiff continued to handle all inbound leads while she acclimated.

3.37    Q4 2021: Earlier in 2021 Plaintiff had started a relationship with Dave and Busters,

working on multi-location theme quizzes. By Q4 Plaintiff was deep in conversations with them to launch a co-branded trivia night at most to all locations, and provide staff for their bingo and football nights. It was an exceptionally lucrative deal with the potential to be worth over a million dollars a year. (100 locations, 52 weeks in a year, $185/week for trivia, plus theme nights plus staffing for bingo and football.) Christopher's response to the deal was to be worried it would be too much to handle and that it would be a burden. Mike Ferril was very enthusiastic about the opportunity as was Bryan Carr.

    3.38    By Q4 Plaintiff had been given several rounds of pay raises, and the only feedback she had received regarding sales was that sales was beating expectations, and this sentiment was repeatedly echoed at weekly meetings with ops, marketing, sales, Jonpaul, and Christopher.

    3.39    End of Year Meeting with Department Heads: Christopher called for a 2 day zoom meeting. The two key takeaways were that marketing had done $0 in revenue, and Plaintiff would eventually be allowed to hire a second salesperson. Plaintiff was pressing because she wanted to grow sales via marketing directly to breweries and regional chains, but without additional staff that was going to be impossible. The bottleneck became sales staff. Plaintiff refused to require Danielle to work overtime without pay, despite Plaintiff having been doing so for years. Plaintiff was eager to grow sales as that was the only way she could grow her pay.

    3.40    Q1 2022: Plaintiff proposed movement on two separate initiatives: 1. A merch store and 2. A customer loyalty program. The goal with the merch store was to open up an avenue for revenue generation. The goal with the loyalty program was to differentiate from every other trivia company, and justify our higher price point. The loyalty program was prioritized as the first focus,

and that had been announced by the time Plaintiff was terminated. The merch store was held up because Christopher wanted to spearhead all of the art, and he didn't hold anyone to deadlines. It was clear early into that project that it would be late Q2 if not Q3 before there was any hope of launching the store. The loyalty program was something Plaintiff designed from the ground up though.

3.41    Plaintiff had started drafting terms for the multi-location deal with Dave and Busters after Mike Ferril joined Plaintiff on a conference call with Christopher and Bryan to convince Christopher to go through with the Dave and Busters deal.

3.42    At some point in March Plaintiff was given a raise for her efforts and for continuing to raise revenue her terminal pay was $92,000. Plaintiff was at this point directly reporting to Mike Ferill, and had limited interactions with Christopher. Mike did nothing but give Plaintiff positive feedback and there was no indication that her job was in danger.

3.43    On March 8th or 9th Plaintiff met with her new immediate supervisor, Mike Ferril. In addition to being the CFO, he had been designated a person employees could take HR complaints and concerns to. Plaintiff hadn't intended on saying anything, but he mentioned noticing that Plaintiff seemed unhappy. Plaintiff started talking and describing years of persistent company mistreatment of herself and women in general, and explained that Christopher Short (CEO) was a big part of the problem.  Plaintiff articulated that she was not alone in her  concerns. Plaintiff mentioned the disparity in how women versus men were treated.  Plaintiff discussed how isolating it felt to be branded an alien simply because she had a different upbringing than everyone else in the company, and a different cultural reference point. Plaintiff confirmed that she was

speaking to him as an HR person in that moment. Plaintiff articulated she was filing an official complaint. Mike said he had a soft spot for Christopher, but also that what Plaintiff had said was disturbing and he needed to think about it. He did not ask for anything in writing at that time. On that same day, and after the discussion Plaintiff confided in Bryan Carr (Director of Marketing) that she had finally spoken out about the things that had been troubling her for so long. Bryan suggested she might have made a mistake and that she should not have said anything.

3.44    3/11/2022:  Mike asked Plaintiff if they could chat. Plaintiff expected he was going to ask her to document exactly what her complaints were. Instead he reiterated that he was deeply troubled by everything she had told him, and told Plaintiff that if she was as unhappy as she said about how things operated at the company, that he would "help Plaintiff transition out of Geeks Who Drink."  Plaintiff broke down in tears. He continued to explain to Plaintiff how he would help her transition out of the company, and would not stop talking about "transitioning me" until Plaintiff apologized for speaking up and promised him that she was over-reacting and not bothered by anything going on in the company. The message was unambiguous. Pursuing any form of complaint would result in termination (or "transitioning" as he called it.)

3.45    On that same day, and immediately after that discussion Plaintiff confided in Bryan Carr again. This time saying Plaintiff feared she was going to be terminated, and relating to him what Mike had said to her. Bryan reiterated that going to Mike was a mistake because "speaking up to Mike is an official complaint, not venting," so Mike had to "take the complaint to Dicker" (the owner) as well as Christopher. Bryan said he thought that Mike was not interested in firing Plaintiff though, and that Mike was impressed with how sales was running overall.

3.46    Early March Plaintiff was told she was eligible for a performance based pay raise from $85k/yr to $92k/yr.

3.47    Mid-March.  Post-March 11 meeting Plaintiff put together a report for Mike to outline the status of sales, and how sales was running under Plaintiff's direction versus how it had run in the past. He expressed nothing but satisfaction of sales under her direction and expressed that he had no desire to revisit the old sales methods as they were costly and did not grow the company in a sustainable manner. He claimed to have taken Plaintiff's report to the company owner as evidence that she was doing a good job, and that her methods were a vast improvement over old methods.

3.48    Additionally, Mike expressed extreme satisfaction with Plaintiff's work on a highly-lucrative deal with Dave and Busters that would have added 60+ bars to the Geeks roster by August, and well over 100 before the year ended. In addition to the traditional trivia business, Dave and Busters intended on hiring Geeks Who Drink to staff several other entertainment events. Mike was not only on board, but when Plaintiff took the deal to Christopher/CEO, Mike openly supported the move.

3.49    Late March: Plaintiff provided Mike with a blueprint for increasing client retention. (A blueprint Plaintiff previously provided Christopher, but Christopher ignored.) He was again satisfied and expressed a job well done.  Between March 11 and Plaintiff's termination Plaintiff conceived and managed the launch of a client loyalty program designed to increase sales and retention. More praise.  Plaintiff started launching an e-commerce store, although after delays on Christopher's end, and Christopher failing to meet deadlines, the store launch was pushed back.

3.50    Throughout all of Q1 2022,  Plaintiff had been readying sales to make a marketing push ("outbound sales"). Plaintiff had the tech department scrape the owner names, addresses, and email addresses of every member of the Brewer's Association (with some filtering parameters). Plaintiff had secured approval to initiate a campaign to start sending out postcards and mailers to those breweries. The plan was to utilize PostGrid (or whatever Plaintiff could get approved) to set up automations in HubSpot to send a combination of post cards, emails, and phone calls to attract new clients. The plan was based on the success of past mail out campaigns Plaintiff had conducted when previously in sales. Mike approved of the plan as her boss. He also knew Plaintiff needed staff to implement it.

3.51    On weekly calls with operations, sales, marketing, Christopher Short, and Mike Ferril the feedback was unambiguous: Numbers were good, growth was good, everyone was happy. In order to increase the rate at which new bars were being added, Plaintiff insisted a new hire was necessary. Plaintiff was repeatedly told she had to wait. But again, week after week, the only feedback was the "sales is on track".

3.52    Early to Mid-April:  Plaintiff reiterated to Mike a concern Plaintiff had since taking over as Director of Sales – a lack of staff, and a desire to hire. Plaintiff expressed dissatisfaction that male-led departments were allowed to hire, but the women of sales were simply expected to work round the clock without overtime or commission. He went back and forth on if he would allow Plaintiff to hire someone, as he was over Plaintiff and had to approve the additional staff. Amid the indecision, and still in the first two weeks of April, Mike called Plaintiff on a day off to tell Plaintiff that Christopher Short and John Dicker wanted sales to engage in one-to-one direct

sales. (Essentially cold calling bars.) Plaintiff said that she wanted any such requests in writing as her pay was tied to revenue, and based on the report she pulled together for Mike, Plaintiff had a wealth of evidence that suggested such efforts would not increase sales. Plaintiff indicated that she would follow orders, but she wanted an assurance that if the efforts had the same outcomes as they had when John Dicker was running sales, it would not be her neck on the line. Plaintiff was particularly concerned given that Mike admitted that he realized Plaintiff was being asked to do something that she had clearly demonstrated with numbers did not work, but Mike also was reluctant to offer Plaintiff any assurances that she would be safe if the results were more of the same. Additionally, Plaintiff reminded Mike that any expansion of sales required additional staff, and again he waffled on if she would be allowed to hire. Time and time again, Plaintiff's pay was tied to the decision of others, and outside her ability to control.

3.53    The first Tuesday in April, in the weekly joint sales and ops meeting, Mike unambiguously stated that he was calling off hiring another sales person until the economy turned around. He said that he was worried about a recession, and didn't want to hire someone only to have business slow down. Plaintiff was extremely frustrated about the decision, but echoed his concerns about the economy on the call so as not to appear "against" him. A week later Mike again changed his mind, said Plaintiff could hire someone, and that very day Plaintiff told Mike that she already had her hire picked. Mike told Plaintiff that she could not immediately hire anyone, and that she would have to post a job application. Within hours Plaintiff delivered Mike a draft job posting, and said all she needed was a green light and she would post it.

3.54    When Mike told Plaintiff that she wasn't allowed to directly hire anyone, Plaintiff

became upset and relayed her frustration to both Bryan Carr and Stefanie Thomas, so they knew Plaintiff had someone lined up. Plaintiff's frustration was rooted in the company's inconsistency regarding hires. The entire c-suite was staffed by men who were given jobs that were never open for interviews, and that for various reasons the men weren't actually qualified to hold. Spouses of men were given jobs for simply being married to a male employee. Men in general were allowed to hire whomever they pleased. The moment a female director needed a hire, all the sudden there was a process.

3.55    Mike sat on that draft job posting for nearly 2 weeks until Plaintiff was fired without ever allowing her to hire anyone. Any failure to add sales staff was squarely on Mike. The failure to add sales staff was the hold up in pursuing increased marketing from the sales team, making that failure also Mike's. Mike was a man however, and the blame was passed along to a woman. Conveniently it was passed along to a woman who had recently been told she would be "transitioned out of the company" for speaking out against the mistreatment of women.

3.56    Plaintiff was given a pay raise from $85k/yr to $92k/yr and then terminated in a span of less than 2 months! The pay raise had been approved at the end of February to take effect starting in mid-March. It was a performance-based raise.

3.57    Christopher continued calling Plaintiff an alien and allowed others to mock her culture right up until the bitter end.  Plaintiff was treated like a second-class citizen along with Stefani Thomas right up until the bitter end. That did NOT change. Plaintiff was fired and that was most certainly due to her reporting the harassment.

## IV.

## FIRST COUNT

### 42 U.S.C. § 1981 – RACIAL DISCRIMINATION IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

4.01.    The foregoing paragraphs of this Complaint are incorporated in this count by reference as fully as if set forth at length herein.

4.02.    42 U.S.C. §1981 provides that:

"**§ 1981.  EQUAL RIGHTS UNDER THE LAW**

(a)  Statement of equal rights. – All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b)  'Make and enforce contracts' defined. – For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c)  Protection against impairment. – The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State Law."

4.03    Defendant has deprived Plaintiff of her right to make and enforce contracts and to "the full and equal benefit of all laws and proceedings" as is enjoyed by white citizens, in violation of 42 U.S.C. § 1981.

4.04    Defendant has engaged in a single, continuous course of conduct of discrimination against Plaintiff because of her race, gender,  national origin and in retaliation, in order to destroy Plaintiff, her career, and her professional life.

4.05    Such discrimination by Defendant against Plaintiff was intentional and was a motivating factor in Defendant's conduct toward Plaintiff.  Accordingly, Plaintiff is entitled to recover damages from Defendant for back pay, front pay, overtime pay, past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life and other nonpecuniary losses.  Further, this discrimination was done by Defendant with malice or with reckless indifference to Plaintiff's federally protected rights.  Plaintiff is therefore also entitled to recover punitive damages in a sum which is in excess of the minimum jurisdictional limit of this Court.  Plaintiff also seeks to recover all costs of Court, attorney's fees, and expert fees.

## V.

### SECOND COUNT

### DISCRIMINATION, HARASSMENT, HOSTILE ENVIRONMENT AND RETALIATION BASED UPON SEX (GENDER), RACE AND DISABILITY IN VIOLATION OF CHAPTER 21 OF THE TEXAS LABOR CODE

5.01.    The foregoing paragraphs of this Complaint are incorporated in this Count as fully as if set forth at length herein.

5.02.    Plaintiff was an employee within the meaning of The Texas Labor Code and belongs to a class protected under the Code, namely she is female and her national origin is Italian.

5.03.    Defendant is an employer within the meaning of Chapter 21 of the Texas Labor code.

5.04.    Defendant intentionally discriminated against Plaintiff caused her to be harassed, subjected her to a hostile environment and retaliated against her because of her gender, race and

national origin in violation of the Texas Labor Code including the harassment by upper management which Defendant failed to protect her from. Furthermore, Defendant retaliated against Plaintiff by terminating Plaintiff. Plaintiff was fired without good reason, giving as a pretext the reason that Plaintiff failed to report the sexual and other harassment soon enough.

5.05. All conditions precedent to filing this action for discrimination, harassment, hostile environment and retaliation under state law have been met. Plaintiff timely filed her charge of discrimination and has received her Notice of Right to Sue within 90 days of filing this original action. (*See* **Exhibit A**).

5.06. Defendant violated the Texas Labor Code by discharging Plaintiff and/or discriminating against Plaintiff with compensation, terms, conditions or privileges of employment because of Plaintiff's sex and race. Discrimination, harassment, and hostile environment were a motivating factor in Defendant's actions toward Plaintiff. Defendant retaliated against Plaintiff by firing her after she complained of discrimination, harassment and hostile environment.

5.07. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered significant financial loss, including the loss of her job and the loss of wages, salary and employment benefits.

5.08. Such discrimination harassment, hostile environment and retaliation by Defendant against Plaintiff was intentional. Accordingly, Plaintiff is entitled to recover damages from Defendant for back pay, front pay, past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Further, this

discrimination was done with malice or with reckless indifference to Plaintiff's federally protected rights. Plaintiff is therefore entitled to recover punitive damages.

5.09.　Plaintiff is entitled to an award of attorneys' fees and costs under Title VII as well as reimbursement of expert witness fees.

**VI.**

**JURY DEMAND**

6.01.　PLAINTIFF DEMANDS A TRIAL BY JURY.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have and recover the following relief against Defendant:

1. Judgment for back pay and front pay and all past and future lost fringe benefits;

2. Judgment for actual damages in the amount of past and future lost earnings and benefits, and damages to past and future earnings capacity;

3. Compensatory damages for the humiliation, damage to reputation, mental and emotional distress, and pain and suffering Plaintiff has experienced and endured as a result of the actions of Defendant;

4. The costs and expenses incurred by Plaintiff in seeking new employment;

5. Damages for past and future mental anguish and emotional distress and damages to reputation;

6. Economic and reliance damages,

7.      Prejudgment and postjudgment interest at the maximum legal rate;

8.      Attorneys' fees;

9.      Expert's fees;

10.     All costs of court; and

11.     Such other and further relief to which Plaintiff may be justly entitled.

Dated: April 3, 2023

Respectfully submitted,

**KILGORE & KILGORE, PLLC**

By  *W. D. Masterson*

W. D. Masterson
Texas State Bar No. 13184000
wdm@kilgorelaw.com
3141 Hood Street, Suite 500
Dallas, TX  75219
214-969-9099 - Telephone
214-953-0133 – Fax

**ATTORNEYS FOR PLAINTIFF
MARY KATHLENE DESSI**